**Attachment 1 ᴮ Civil Complaint**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
_____ DIVISION

Larry E. Urbant

(Enter your full name)
  Plaintiff(s)

CASE NUMBER: **W-20-CV-853-ADA**

(Supplied by Clerk's Office)

Daul Dupont

(Enter full name of each Defendant)
  Defendant(s)

## COMPLAINT

First Paragraph (Name and Address of Plaintiff)

Second Paragraph (Name and Address(es) of Defendant(s))

Third Paragraph (Jurisdiction Plea)

Fourth Paragraph (Allegation 1)

Fifth Paragraph (Allegation 2) ...

The final paragraph should contain a statement of the relief you are seeking. This paragraph should not be numbered.

Signature
Name (Typed or Printed)  LARRY E. URBANI
Address  P.O. BOX 582 WILLIS, TX 77378
Telephone Number

27

**Rev. Ed. October 26, 2017**



| LARRY E. URBANI | § | US DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **WESTERN DISTRICT** |
| **DOW/DUPONT** | § | |
| *Defendant.* | § | |
| | § | |

## NOTICE OF CLAIM

To:     Defendant, Dow/Dupont 1501 Larkin Center Dr, Midland, Michigan 48642.

Plaintiff **LARRY E. URBANI**, inventor of the patented #4,071,943 ELVAX bottle and containers provided the United States government with a true and tested proven method for a food-grade, self-standing, biodegradable bottle. In term, a method for reducing the increasing landfill problems impacting the world as we know it.

**EXHIBIT A:** The test taken at University of Oregon was completed and passed as requested

**EXHIBIT B:** After, the production of **LARRY E. URBANI'S** patented bottle began with companies such as Dupont, Dow, Monsanto and Coca-Cola with approval by the FDA

**EXHIBIT C, D, E AND F:** The house of representatives and the senate passed the bill for $282.5 million for a national effort to find a solution which **LARRY E. URBANI** did with the patented #4,071,943 bottle and containers

**EXHIBIT G:** United States Patent confirmation listing **LARRY E. URBANI** as the inventor of the wax container material. Application number 719,360 which was filed September 1, 1976

**EXHIBIT H:** Notice from the United States Environmental Protection Agency on November 26, 1976 confirming failure to compensate **LARRY E. URBANI** for development of the new wax material which was used in making the bottles and containers. **LARRY E. URBANI** has taken the view of a timelessness research to find the United States Government in collision and concealment under the 5th amendment.

Respectfully submitted,

1

Dow/Dupont
1501 Larkin Center Dr.
Midland, MI 48642


Hello Sirs! and CEO Mr. Edward D. Breen:                    April 17, 2020
               Chairman Mr. Edward D. Breen

I am Larry E. Urbani, the inventor of the patented ELVAX bottle and containers #4,071,943. We want you to continue making a living for all your employees and selves, in the millions & billions. We just require the original $480,000,000 and we will disappear.

You just go on as you always have been with no bumps in the road.

You will own the patent #4,071,943 as you always tell the world. Also Nathaniel Wyeth your inventor did not discover the food grade self standing ELVAX bottle and container that is designed to be degradable also.

I am the sole inventor of the patented ELVAX bottle. I did what the government and your scientists, engineers and chemists could not do. I solved the problem.

I desire this to end. Please send the $480,000,000 or make a reasonable offer.

Signed Larry E. Urbani


P.O. Box 582
Willis, TX 77378
281-222-6760
ecosource@icloud.com

By:  *Larry E. Urbani*


UNIVERSITY OF OREGON

EXPERIMENTAL CENTER
FOR THE
ADVANCEMENT OF
INVENTION AND INNOVATION
College of Business Administration

116 Gilbert Hall
EUGENE, OREGON 97403
Telephone (503) 686-3525

February 24, 1978

Mr. Larry Urbani ~~209 Mill Street~~ RT4, BOX 268
~~Lucedale, MS  39452~~ VANCLEAVE, MISS
                                39564

Re:  **#2471**
     **Container Material**

Dear Mr. Urbani:

**The evaluation of your invention has been completed, and the
results are summarized in the enclosed computer printout.**

Our **evaluation** is designed to offer you information about
some of the **strengths and weaknesses** of your proposed product.
**Thirty-three criteria are considered** in determining a product's
**potential for success.**  Each criterion score is then programmed
into a computer, and the analysis is completed.

The computer printout should indicate the negative or positive
possibilities of your invention and whether or not your idea
warrants further research.  Unfortunately, due to our limited
staff and resources, the Innovation Center cannot conduct this
research for you.  We would like to make some suggestions,
however, for possible activities on your part should you decide
on the basis of the printout to further develop your invention.
Some of these suggestions will not apply, of course, to some
products or, you might have already pursued some of them;
however, we feel that as underlined general guidelines, these principles
will be useful in helping you with your idea.  The information
you receive from these activities should assist you in making
an intelligent decision regarding the investment of additional
time and/or money into your idea.

Please do not hesitate to contact us if you have questions
about the enclosed printout, or the suggestions on market
research.

We wish you every success in the future.

Sincerely,

Robert H. Kono
Client Relations Coordinator

RHK:ckw

## Suggested Guidelines

There are four basic areas that need to be explored when you are working with a new idea; they are product development, market, protection, and finances. Each one of these areas needs to be carefully considered in order to increase the probability of market success.

First, some development work should be done on the product, so that problems can be discovered, and eliminated. A functional prototype should be available, so that potential buyers may view it; its features should be visible and obvious, and the cost of manufacturing estimated. If appearance is important, then the prototype should be attractively designed. Some testing should be completed. Most of all, the prototype must not look as if it were put together with tape and chewing gum; it should be, and look like, the product of care and devotion on the part of the inventor.

During the second phase -- that of marketing -- you should make a clear demonstration that your product is superior to its competition; its advantages must be emphasized. If necessary, you will need to show how your product fits into existing systems. Lower cost is often a critical factor in purchasing a new product; if your product will cost less than the existing competition, emphasize this point. Should your product cost more than the competition, you will need to show advantages that override money and why consumers should pay the increased price.

Your product will probably need to be protected by a patent (or, in some cases, a copyright); for most new ideas, a patent or copyright is useful in protecting exclusivity. We suggest that you contact a patent attorney or agent for assistance. Once the idea has been patented you can show it to potential buyers without fear of losing your rights to the product.

Finally, you will need to investigate the financing of your product. Preferably, the "front-end load" should be small -- that is, the manufacturer or financial backer need not invest a large sum in order to get the idea on the market. The return on the investment ideally, should be substantial, and, preferably, immediate. Various kinds of information should be gathered: sales potential of the product, sources of materials at low prices, whether or not the product can be manufactured with existing facilities, or if new machines and tools will have to be created first, how much the "tooling up" will cost, and so forth.

Once you have this information in hand, you can begin approaching corporations in the appropriate field to determine their interest. You may want to write a prospectus about your invention to present to these companies, or to potential financial backers. If you choose to start your own business around your product, you will also be in a position to do so at this point.

We hope that the above information provides you with some idea of the directions in which to proceed with your invention. We encourage your continued creativity.

*Evaluators' Comment re #2471:*

*Although the technology is available, the product needs to be thoroughly tested for durability, etc., by an independent firm in order to see how useful it would be as an alternative container for products.*

P R E L I M I N A R Y   I N N O V A T I O N   E V A L U A T I O N

FILE - 2471

INVENTOR - URBANI, L. & SMITH, K.

INNOVATION - CONTAINER MATERIAL


OUR INITIAL EVALUATION OF YOUR INNOVATION HAS BEEN COMPLETED.
THIRTY-THREE (33) AREAS OF CONCERN FOR NEW PRODUCT INTRODUCTION ARE
GROUPED INTO FIVE (5) MAJOR FACTORS. THE COMPLETION PHRASE(S) GIVEN
FOR EACH OF THE THIRTY-THREE (33) AREAS OF CONCERN CORRESPOND TO THE
JUDGEMENT OF SEVERAL EVALUATORS. THEIR RESPONSES HAVE BEEN AVERAGED
BY THE COMPUTER AND THE APPROPIATE COMPLETION PHRASE(S) TO EACH AREA
OF CONCERN IS PRINTED BELOW. IF TWO PHRASES ARE PRINTED FOR AN AREA
OF CONCERN, THEN THE SCORE FOR YOUR INNOVATION FALLS BETWEEN THE TWO
POSSIBLE COMPLETION PHRASES.
THE PRELIMINARY EVALUATION SHOULD PROVIDE YOU WITH SOME INDICA-
TION OF THE MARKETABILITY AND PROBABLE SUCCESS OF YOUR INNOVATION.


SOCIETAL FACTORS
****************

1. LEGALITY (P.23) : IN TERMS OF APPLICABLE LAWS (PARTICULARLY
        PRODUCT LIABILITY), REGULATIONS, PRODUCT STANDARDS, THIS IDEA
        /INVENTION/NEW PRODUCT :

    WILL MEET THEM WITHOUT ANY CHANGES.

2. SAFETY (P.23) : CONSIDERING POTENTIAL HAZARDS AND SIDE EFFECTS,
        THE USE WILL BE:

    SAFE WHEN USED AS INTENDED, WITH NO FORESEEABLE HAZARDS.

3. ENVIRONMENTAL IMPACT (P.27) : IN TERMS OF POLLUTION, LITTER, MISUSE
        OF NATURAL RESOURCES, ETC., USE MIGHT :

    HAVE NO EFFECT ON THE ENVIRONMENT.

    HAVE A POSITIVE IMPACT ON THE ENVIRONMENT.

4. SOCIETAL IMPACT (P.29) : IN TERMS OF THE IMPACT (BENEFIT) UPON THE
        GENERAL WELFARE OF SOCIETY, USE MIGHT :

    HAVE NO EFFECT ON SOCIETY.

    HAVE A POSITIVE BENEFIT TO SOCIETY.

5. **FUNCTIONAL FEASIBILTY** (P.31) : IN TERMS OF INTENDED FUNCTIONS, WILL IT ACTUALLY DO WHAT IT IS INTENDED TO DO ?

   IT WILL WORK BUT MINOR CHANGES MIGHT BE NEEDED.

6. **PRODUCTION FEASIBILTY** (P.33) : WITH REGARD TO TECHNICAL PROCESSES OR EQUIPMENT REQUIRED FOR PRODUCTION, THIS INVENTION WILL :

   HAVE ONLY MINOR PROBLEMS.

7. **STAGE OF DEVELOPMENT** (P.34) : BASED ON THE AVAILABLE INFORMATION, THERE IS :

   A ROUGH PROTOTYPE WHICH DEMONSTRATES THE CONCEPT BUT IS NOT FULLY DEVELOPED AND TESTED.

8. **INVESTMENT COSTS** (P.35) : THE AMOUNT OF CAPITAL AND OTHER COSTS NECESSARY FOR DEVELOPMENT TO THE MARKET-READY STAGE WOULD BE :

   HEAVY – PROBABLY RECOVERABLE.

9. **PAYBACK PERIOD** (P.36) : THE EXPECTED PAYBACK PERIOD(TIME REQUIRED) TO RECOVER INITIAL INVESTMENT) IS LIKELY TO BE :

   FOUR TO SIX YEARS.

10. **PROFITABILITY** (P.40) : PROFITABILITY IS DEFINED AS THE EXTENT TO WHICH ANTICIPATED REVENUES WILL COVER THE RELEVANT COSTS(DIRECT, INDIRECT, AND CAPITAL). ANTICIPATED REVENUES :

    WILL COVER DIRECT AND INDIRECT COSTS BUT MIGHT NOT MEET CAPITAL COSTS(ROI).

    WILL COVER DIRECT AND INDIRECT COSTS AND MEET MINIMUM CAPITAL COSTS(ROI).

11. **MARKETING RESEARCH** (P.41) : THE MARKETING RESEARCH REQUIRED TO DEVELOP A MARKET-READY PRODUCT IS ESTIMATED TO BE :

    RELATIVELY DIFFICULT AND COMPLEX.

    MODERATELY DIFFICULT.

12. **RESEARCH AND DEVELOPMENT** (P.42) : THE RESEARCH AND DEVELOPMENT REQUIRED TO REACH THE PRODUCTION-READY STAGE WILL BE :

    MODERATELY DIFFICULT.

RELATIVELY EASY AND SIMPLE.

DEMAND ANALYSIS FACTORS
*****************************

13. POTENTIAL MARKET (P.45) : THE TOTAL MARKET FOR PRODUCTS OF THIS
        TYPE MIGHT BE :

    LARGE - BROAD NATIONAL MARKET.

    VERY LARGE - EXTENSIVE NATIONAL AND POSSIBLE INTERNATIONAL MARKET.

14. POTENTIAL SALES (P.48) : EXPECTED SALES OF THIS PRODUCT MIGHT BE :

    LARGE.

15. TREND OF DEMAND (P.49) : THE MARKET DEMAND FOR PRODUCTS OF THIS
        TYPE APPEARS TO BE :

    STEADY - DEMAND EXPECTED TO REMAIN CONSTANT.

    GROWING SLOWLY.

16. STABILITY OF DEMAND (P.52) : THE FLUCTUATION IN DEMAND IS LIKELY
        TO BE :

    PREDICTABLE.

17. PRODUCT LIFE CYCLE (P.52) : THE PRODUCT LIFE CYCLE IS LIKELY
        TO BE :

    FIVE TO SEVEN YEARS.

    EIGHT TO TEN YEARS.

18. PRODUCT LINE POTENTIAL (P.55) : THE POTENTIAL FOR ADDITIONAL
        PRODUCTS, MULTIPLE STYLES, QUALITIES, PRICE RANGES, ETC.
        IS :

    MODERATE - MULTIPLE MARKETS/USE POTENTIAL.

MARKET ACCEPTANCE FACTORS
*****************************

19. COMPATIBILTY (P.57) : COMPATIBILITY WITH EXISTING ATTITUDES AND
        METHODS OF USE IS :

    LOW - SOME CONFLICT; WILL SLOW MARKET ACCEPTANCE.

20. LEARNING (P.59) : THE AMOUNT OF LEARNING REQUIRED FOR CORRECT USE

IS :

LOW - MINIMAL INSTRUCTIONS NEEDED.

21. NEED (P.61) : THE LEVEL OF NEED FILLED OR UTILITY PROVIDED BY THIS
INNOVATION IS :

MODERATE - FULFILLS BOTH PSYCHOLOGICAL AND PHYSICAL NON-ESSENTIAL
NEEDS.

HIGH - FULFILLS EITHER BASIC PSYCHOLOGICAL AND PHYSICAL NEEDS.

22. DEPENDENCE (P.63) : THE DEGREE TO WHICH THE SALE OR USE OF THIS
PRODUCT IS DEPENDENT UPON OTHER PRODUCTS, PROCESSES OR
SYSTEMS IS :

MODERATE - REASONABLE MARKET CONTROL.

23. VISIBILITY (P.65) : THE ADVANTAGES AND BENEFITS ARE :

OBSCURE - REQUIRES SUBSTANTIAL EXPLANATION.

VISIBLE - REQUIRES SOME EXPLANATION.

24. PROMOTION (P.64) : THE COSTS AND EFFORT REQUIRED TO PROMOTE THE
ADVANTAGES, FEATURES, AND BENEFITS ARE LIKELY TO BE :

HIGH RELATIVE TO EXPECTED SALES.

MODERATE - COMMENSURATE WITH EXPECTED SALES.

25. DISTRIBUTION (P.67) : THE COST AND DIFFICULTY OF ESTABLISHING
DISTRIBUTION CHANNELS ARE LIKELY TO BE :

MODERATE - COMMENSURATE WITH EXPECTED SALES.

LOW RELATIVE TO EXPECTED SALES.

26. SERVICE (P.68) : THE COST AND DIFFICULTY ASSOCIATED WITH PROVIDING
PRODUCT SERVICE IS LIKELY TO BE :

VERY LOW - WILL REQUIRE LITTLE OR NO PARTS AND SERVICE.

COMPETITIVE FACTORS
******************

27. APPEARANCE (P.72) : RELATIVE TO COMPETITION AND/OR SUBSTITUTES,
APPEARANCE IS LIKELY TO BE PERCEIVED AS :

SIMILAR TO OTHER PRODUCTS.

28. **FUNCTION** (P.73) : RELATIVE TO COMPETING AND/OR SUBTITUTE PRODUCTS, SERVICES OR PROCESSES, THE FUNCTION PERFORMED MAY BE PERCEIVED AS :

SIMILAR - NOT NOTICEABLY BETTER.

SUPERIOR - MAY BE PROMOTED AS AN IMPROVEMENT.

29. **DURABILITY** (P.74) : RELATIVE TO COMPETITION AND/OR SUBSITUTES, DURABILITY OF THIS PRODUCT WILL BE PERCEIVED AS :

INFERIOR - CANNOT BE PROMOTED AS AN IMPROVEMENT.

30. **PRICE** (P.75) : RELATIVE TO COMPETITION AND/OR SUBSTITUTE PRODUCTS, THE SELLING PRICE IS LIKELY TO BE :

ABOUT THE SAME.

LOWER - A COMPETITIVE ADVANTAGE.

31. **EXISTING COMPETITION** (P.77) : EXISTING COMPETITION FOR THIS INNO-VATION APPEARS TO BE :

HIGH - ONLY A SMALL MARKET SHARE CAN BE GAINED.

32. **NEW COMPETITION** (P.78) : COMPETITION FROM NEW ENTRANTS OR COMPETI-TIVE REACTION IS EXPECTED TO BE :

HIGH - PRODUCT LEAD WILL BE RELATIVELY SHORT.

33. **PROTECTION** (P.80) : CONSIDERING PATENTS (OR COPYRIGHTS), TECHNICAL DIFFICULTY OR SECRECY, THE PROSPECTS FOR PROTECTION APPEAR TO BE :

CAN DEFINITELY BE PATENTED, COPYRIGHTED AND/OR LONG SECRECY POSSIBLE.


IF MORE INFORMATION IS DESIRED, REGARDING EACH CRITERION, REFER TO THE "GUIDE TO INVENTION AND INNOVATION EVALUATION". PAGE NUMBERS FOR EACH CRITERION ARE SHOWN IN PARENTHEIES BESIDE EACH TOPIC.
IF YOU HAVE ANY QUESTIONS CONCERNING THE ABOVE EVALUATION'S FORMAT, CONTENT, OR IMPLICATIONS, PLEASE CONTACT:

E.C.A.I.I.
GILBERT HALL
COLLEGE OF BUSINESS ADMINISTRATION
UNIVERSITY OF OREGON
EUGENE,OREGON   97403
PHONE: 503-686-3326



1600 PENNSYLVANIA AVE N.
W.

WASHINGTON, ~~DC~~ DC 20500

PRESIDENT DONALD J. TRUMP

*(handwritten)* IMPORTANT AD

## PLASTIC BAN DELAYED

# Monsanto Still Confident

*(handwritten)* ACYLONTRILE

ST. LOUIS (UPI) — The Monsanto Co. says it is confident that public hearings will show the firm's plastic beverage bottles are safe.

A federal appeals court in Washington has set aside until May 18 a ban on the bottles proposed by the Food and Drug Administration. The court ordered the agency to hold prompt public hearings.

The FDA says tests show the bottles have leaked the chemical acylonitrile into the container's contents. The agency said the chemical has caused birth defects and nervous system lesions in laboratory animals.

Monsanto, which made the bottles for the Coca-Cola Co. and planned to market them for other beverages, asked for the hearings to challenge the FDA findings. A company spokesman said the hearings will demonstrate the safety of the plastic bottles.

In a letter to be mailed Monday to shareholders, the company said the suspension of its bottle operations could cost the company 40 to 45 cents a share on 1977 earnings. Last year the company earned $366 million, or $10.05 a share.

The proposed FDA ban last month caused Monsanto to shut down three bottle fabrication plants and a resin plant employing about 800 workers. The plants are in Park Forest, Ill., South Windsor, Conn., Havre de Grace, Md., and Springfield, Mass;

The three-judge appeals court panel called the FDA action "arbitrary and capricious." The judges said the agency "deprived the petitioner of the prompt hearing to which it was statutorily entitled."

---

## Monsanto Co. Closes Three Bottle Plants; FDA Action Is Cited

*By a WALL STREET JOURNAL Staff Reporter*

ST. LOUIS—Monsanto Co. said it will temporarily suspend production at all three of its Cycle-Safe bottle-fabrication plants because of "uncertainties" created by a recent Food and Drug Administration statement on plastic bottles.

Almost 600 employes will be laid off, the company said. Recently, the FDA rescinded its approval of the bottles, though their sale remains legal.

"Our customers have elected to temporarily cancel orders pending clarification from the FDA," E. S. Bauer, executive vice president, said.

The FDA cited studies showing that a material called acrylonitrile, used to make the bottles, might cause growths in test animals. Monsanto had worked on its plastic bottle for about 10 years.

Coca-Cola bottlers have been using the Cycle-Safe bottle.

Mr. Bauer said that Monsanto representatives met twice last week with FDA officials to ensure that the federal agency had all available data about the container.

He said: "We are hopeful that the FDA will act promptly to establish an equitable, realistic and measurable standard for our containers. Monsanto remains confident that Cycle-Safe bottles are completely safe and pose no hazards to consumers."

Bottle plants at South Windsor, Conn., Havre de Grace, Md., and Park Forest South, Ill., were closed at close of business last Friday. A Lopac resin-production unit at Springfield, Mass., was similarly affected.



*(handwritten)* Exhibit B

*(handwritten)* SPELLED DIFFERENT EACH ARTICLE

*(handwritten)* THIS 1976
CYCLE SAFE BOTTLES
600 LOST JOBS
ACRYLONITRILE

Exhibit A
C

# Government wants treasure from trash

WASHINGTON (AP) — Before you throw those egg shells, coffee grounds and orange peels in the trash can, stop and think about this:

The House of Representatives is willing to spend $282.5 million for a national effort to find something useful that can be made from garbage like that.

The House has passed a bill that would supply the money for research aimed at finding ways to use wastes that now burden most municipal governments. The bill now heads Senate approval.

Most Americans haven't given much thought to trash, except to notice if it hasn't been picked up. And the garbageman has just been some guy who runs over your trash can twice a week.

Still, a very few people already have found a variety of highly useful, although not always esthetic, uses for their garbage.

For instance, in Richmond, Va., houses were made from recycled trash several years ago, but potential homebuyers were somewhat wary about living in something made of compressed things somebody else had thrown away. And newspapers not long ago told of a man who built a house out of his collection of beer bottles.

Rep. Fred Rooney, D-Pa., who managed the garbage bill in the House, said one goal would be finding ways to use garbage as a source of fuel, after proper processing and treatment.

Consider this: The Federal Energy Administration said Monday the nation's dependence on foreign oil is still increasing, with imports in the first six months of the year up by 16.7 per cent.

Some energy experts say Americans produce in garbage each year a potential energy source equivalent to 290 million barrels of low sulphur fuel oil or 5 per cent of current domestic oil consumption. And they say total municipal refuse collection could generate 6 per cent of the nation's total annual electric production.

But with $282.5 million at stake there should be lots of other classy suggestions about what to do with all these empty milk cartons, gum wrappers and cigarette butts that litter the homestead.

For instance:

—How about a new automobile made from gnawed chicken bones that runs on gas made from carrot tops, potato eyes and radish roots.

—Or fake eyelashes made from all that spinach you have to scrape off the kids' plates.

—Maybe cement made from coffee grounds, stale bread crumbs and fruit pits. America could have an interstate highway system that smells like a prune danish.

—Or how about wearing the latest in double-knit suits woven from last night's spaghetti dinner.

Cars, clothes, highways and eyelashes made from garbage would be cheap, but they also would have some obvious drawbacks — a certain air about them, you might say.

## Legally Required Deposits on Drink Containers Could Save Consumers $1.8 Billion by 1982, Study Finds

Mandatory deposits on containers of beer and soft drinks could cut consumer expenditures by as much as $1.8 billion by 1982, according to a study by the Federal Energy Administration.

The drop in consumer expenditures would come from the switch to refillable containers which, over the long run, are up to seven times cheaper than one-time containers, the report said.

NATIONAL ENQUIRER                    Page 3

Exhibit D

INSTANT SUCCESSES YET TO BE

NOTE: This is taken from pages 209 and 210 - #7 of chapter Instant successes yet to be, from "Instant Millionaires" by Max Gunther, Published by Playboy Press.

7. A substitute for glass bottles. Manufacturers of drinks and other bottled products have received a lot of criticism lately from those worried about ecology. Glass doesn't burn or rot. Tossed on a city garbage dump, it simply stays there - and the dump piles higher and higher each year. Aluminum cans represent somewhat the same problem. Many cities have nearly run out of dumping space.

What's needed is a substitute material that will burn efficiently in an incinerator or will degrade outdoors - that is, will be broken down chemically and absorbed harmlessly into the soil. Some types of plastic fill these criteria, but in the words of Ballantine's Brzezinski, "the economics are prohibitive. The prices are sometimes ten to fifteen times as high as our current aluminum and glass containers."

Not only must the substitute container be as cheap as standard bottles and cans, it must also be good to look at. And, like glass and aluminum, it must be capable of holding liquids for a long time without corroding, transferring its taste to the contents or undergoing any other chemical change. "This is the toughest part of the problem," says a U. S. government chemist. "We want a container that can stand on a shelf for years with beer or catsup inside it. But as soon as we've emptied this container, we want it to decompose in a hurry. It's a paradox nobody has solved yet."

One university chemist is experimenting with a glass-like material that dissolves readily in water. His idea is to make bottles out of this material, then coat the bottles inside and out with a waterproof varnish. Such a bottle could hold beer or other liquids. After drinking the beer, you would break the bottle, or a bulldozer at the city dump would crush it. The varnish seal would split, allowing rainwater to get at the soluble innards. The bottle would then dissolve. There are some technical and economic problems confronting this idea, however.

The world is still waiting to hear you solution.

11-15-1973 ORIGINAL PUBLISHED

Exhibit
E

# lastic Drink Bottles
# n-Way To Supermarkets

EW YORK (AP) — You ␟d have thought plastic ␟erage bottles were ␟␟ed this month by the ␟␟␟ and Drug ␟inistration because their ␟␟dients of the plastic ␟␟t be linked to cancerous ␟ns.

␟ou are wrong. Industry ␟rces expect about a ␟rter billion of them to be ␟store shelves by the end of ␟ year, and estimate that two years from now the figure will be more than two billion.

The explanation lies in the plastic. The FDA on Sept. 20 banned acrylonitrile, but it said nothing about polyester. The latter has a different chemical makeup, while presenting no differen␟ appearance to the untrained eye.

The FDA decision mea␟␟ that acrylonitrile bottle␟ must be off the market by the end of the year, although spokesmen for that agency say all such bottles may already have been removed from circulation.

That might be the end of one scene, but it's where the play really gets interesting — where a cast of characters interfaces: Coca-Cola, Pepsi-Cola, chemical companies, a big tire concern, the liquor and textile industries, environmentalists, the stock market and, as they say, many, many more.

The curtain lifts with the soft drink companies seeking a safe, shatterproof, easily recyclable bottle. At first, failure; the economics ␟␟␟␟␟␟ Then the

conclusive judgments. The polyester bottle, they note with suspicion, is a throwaway. Throwaways litter.

Goodyear says that won't be so. The 32-ounce and 64-ounce bottles for which polyester is being used aren't the kind you purchase along the roadside, it says. And, it stresses, they're recyclable.

Lest you not understand the significance of that, Thomas Minter, Goodyear executive vice president (research and development), intones these unforgettable lines:

"The polyester bottle you drink from today could be the pants you wear tomorrow."

A show-stealer, he will not be stopped: "Just 12 half-gallon bottles could provide enough fabric for a pair of

pants. Add 18 more and you've got a vest and jacket to match."

Including production costs, he continues, recycled polyester is considerably less expensive than the virgin material. But why recycle at all — why not affix a deposit charge to the purchase and have the bottles returned?

Out of the question, he replies. The purification process demands reheating, and when you reheat a polyester bottle it loses its shape.

And so, for the time being, the polyester curtain falls. But there might be more. Monsanto, which makes acrylonitrile, declares the FDA decision "unwarranted." And that could mean a courtroom scene to follow.

---

d. ☐ An Examiner's Amendment will follow.

5. ☐   Receipt is acknowledged of papers submitted under 35 U.S.C. 119 which papers have been made of record in the file.

6. ☐   Other

MILTON S. MEHR
EXAMINER
GROUP ART UNIT 321

POL-327 (Rev. 9/70)

ditions.

The resistance of *Ultrathene* UE 630 ethylene-vinyl acetate to staining has also been examined. The copolymer is stain resistant to coffee and grape juice at room temperature. However, tincture of iodine and merthiolate (an antiseptic and germicide) stain the resin slightly at room temperature.

To determine stain resistance to iodine, grape juice, coffee, and merthiolate, cut strips of the resin were tested at 70° and 140°F (21° and 60°C). The iodine was a commercially available 2% tincture, the merthiolate a commercially

| Material | Concen-tration | Temperatures 70°F (21°C) | Temperatures 140°F (60°C) |
|---|---|---|---|
| Grape juice | — | S | S |
| Coffee | — | S | O |
| Merthiolate | 0.1% | O | O |
| Iodine | 2% | O | U |

S = satisfactory (no stain)  O = slight stain
U = unsatisfactory (very noticeable stain)

**Table 3** Stain resistance of *Ultrathene* UE 630 to some liquids

available 0.1% tincture. Table 3 lists resistance to staining determined for *Ultrathene* UE 630.

ELVAX APPROVED BY THE FOOD & DRUG

## Food and Drug Administration (FDA) Status

*Ultrathene* ethylene-vinyl acetate copolymer resins meet the FDA food-packaging requirements established in Federal Register, Subpart F, Section 121.2570 and Section 121.2526 (c) conditions of use (Table 2) E.F. and G. Some Ultrathene resins also meet conditions of use C and D.

Section 121.2570 specifies that ethylene-vinyl acetate copolymers of the *Ultrathene* type may be safely used in articles "intended for use in producing, manufacturing, packing, processing, treating, packaging, transporting, or holding food." — Section 121.2526 (c) permits for the same uses paper and paperboard coated with such copolymers. — Conditions D, E, F, and G specify that such copolymers can be safely used for coating containers used for hot filling or pasteurizing below 150°F (65°C) and, provided no heat treatment will take place in the containers, for filling and storing at room temperature and for refrigerated and frozen storage. — Condition C specifies use for hot filling or pasteurizing at temperatures from 150°F (65°C) to the boiling point of water, 212°F (100°C).

Fig. 18 shows an item used in the home, injection-

molded from an *Ultrathene* resin which meets FDA requirements.



**Figure 18** Plastic pourer seal, injection molded from *Ultrathene* resin

cjb 08/08/77

MS Mehr

09/01/76          719,360

Larry H.   Urbani



**U.S. DEPARTMENT OF COMMERCE**
**Patent Office**

Address Only: COMMISSIONER OF PATENTS
Washington, D.C. 20231

R E C E I V E D

AUG 9 1977

LeBLANC & SHUR

LS NO._____

Paper No. 7

**MAILED**

AUG 8 1977

**GROUP 320**

This is a communication from the Examiner in
charge of your application.

Le Blanc and Shur
11th Flr., 1750 K Street, N.W.
Washington, D.C.  20006

Commissioner of Patents

---

1. ☐   The communication filed _____ is informal /non-responsive for the reason(s) checked below and should be

corrected. *APPLICANT IS GIVEN ONE MONTH FROM THE DATE OF THIS LETTER OR UNTIL THE EX-*
*PIRATION OF THE PERIOD FOR RESPONSE SET IN THE LAST OFFICE ACTION (WHICHEVER IS*
*LONGER) WITHIN WHICH TO CORRECT THE INFORMALITY.*

   a. ☐ The amendment to claim(s)_____ , filed _____ , fails to comply with the pro-

      visions of rule 121 and is accordingly held to be non-responsive. A supplemental paper correcting the informal

      portions and complying with the rule is required.

   b. ☐ The paper is unsigned. A duplicate paper or ratification, properly signed, is required.

   c. ☐ The paper is signed by _____ , who is not of record. A ratification or a

      new power of attorney with a ratification, or a duplicate paper signed by a person of record, is required.

   d. ☐ The communication is presented on paper which will not provide a permanent copy. A permanent copy, or a

      request that a permanent copy be made by the Office at applicant's expense, is required. See M.P.E.P. 714.07.

   e. ☐ Other

2. ☐   In accordance with applicant's request, *THE PERIOD FOR RESPONSE FROM THE OFFICE ACTION DATED*

_____ *IS EXTENDED TO RUN*_____ *MONTH(S).*

No further extension will be granted unless approved by the Commissioner. Rule 136(b).

3. ☐   This application is being forwarded to Abandoned Files Unit in view of:

   a. ☐ The letter of express abandonment which is in compliance with rule 138.

   b. ☐ Applicant's failure to file the response received _____ within the period set.

4. ☑   All of the claims being allowable, prosecution on the merits is closed in this application and the Notice of Allowance

or other appropriate communication will be sent in due course, in view of:

   a. ☑ Applicant's communication filed Jul 18, 1977 .

   b. ☐ Telephone interview with_____ on _____ .

   c. ☐ Personal interview with_____ on _____ .

   d. ☐ An Examiner's Amendment will follow.

5. ☐   Receipt is acknowledged of papers submitted under 35 U.S.C. 119 which papers have been made of record in
the file.

6. ☐   Other

*Milton S. Mehr*

MILTON S. MEHR
EXAMINER
GROUP ART UNIT 321

POL-327 (Rev. 9/70)



FIG 1

FIG 2

FIG 3

FIG 5    FIG 6

FIG 4

[54] **WAX CONTAINER MATERIAL**

[76] Inventor: Larry E. Urbani, Van Cleave, Miss. 39564

[21] Appl. No.: 719,360

[22] Filed: Sept. 1, 1976

[51] Int. Cl.² .............................................. C08L 91/00
[52] U.S. Cl. .............................. 29/525; 215/295; 215/1 C; 260/28.5 A
[58] Field of Search ............... 220/DIG. 30; 215/1 C, 215/321, 341, 295; 29/525; 260/DIG. 43, 28.5 A, 28.5 AV, 23 AR

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,518,803 | 7/1970 | Wunderlich et al. | 215/1 C X |
| 3,536,500 | 10/1970 | Cleerman et al. | 215/1 C X |
| 3,647,111 | 3/1972 | Stager et al. | 260/DIG. 43 |
| 3,996,176 | 12/1976 | Lorenian et al. | 260/28.5 A |

*Primary Examiner*—Milton S. Mehr
*Attorney, Agent, or Firm*—LeBlanc & Shur

[57] **ABSTRACT**

A novel method for containing materials in a container material adaptable to a wide variety of different materials including food products and household chemical products is described. The material utilized is intended to be a substitute for glass, plastic or metal containers, and comprises a resin hardened petroleum wax molded to form the container.

**4 Claims, 6 Drawing Figures**





SINCE THE LAST 6 MONTHS I HAVE BEEN SEARCHING THE INTERNET ABOUT DUPONT USING MY PATENT AS IF IT WERE THEIRS. PATENT # 4,071,943 HAS BEEN RELABELED "GRANT" AND MOVED OFF THE PATENT "LIST" I DON'T KNOW WHAT THIS MEANS.

The process of this invention is intended to be utilized with a wide variety of different types of packaging. Bottles, closed cylinders, rectangular packages, open containers for beverage cans or bottles, flower pots and decanters may all be formulated according to the process of this invention with the above resin-wax blend. In addition, writing implements such as ball point pens or ordinary lead pencils may be formulated according to this invention. In the case of a pen, the normally plastic or metal body used to contain the writing fluid may be molded from the hardened wax of this invention. In the case of a pencil, it is anticipated that the normally wooden portion which contains the writing lead could be of the resin wax of this invention.

The following are then merely representative examples of formulation according to this invention.

With reference to FIG. 1, a bottle 10 is depicted having threads 12 molded therein for attachment of a cap 14. Both the cap 14 and the bottle may be molded from the resin wax from this invention. In addition, a rubber or deformable plastic washer 16 may be disposed within the cap 14 to provide a seal when the cap is placed on the bottle. It will be obvious to those skilled in the art that the cap 14, if desired, could be formulated out of plastic, metal or a metal shell (not shown) could surround the cap for additional protection and to provide a gripping surface for ease in opening.

Most importantly, however, the wax material of this invention containing the resin is sufficiently abrasive-resistant to permit threading a cap of the same material thereon without deformation.

The bottle 10 could have a score line 17 formed therein to permit opening by fracturing along the score line. Such a container could then be opened without removing the cap, as by impact, cutting, or biting.

In the alternative, FIG. 2 depicts a jar cap or bottle cap which may be press-fitted onto a container (not shown).

With reference to FIG. 3, bottle 18 formulated of the resin-wax material of this invention may have a metal ring 20 press-fitted on the neck 22 for cap retention as an alternative to the use of threads. Cap 24 also formulated of the resin-wax of this invention may be equipped with an internal ring 26 having a retaining lip 28 adapted to receive ring 20. Fitting 26 may be constructed of rubber, plastic or the like and is retained by the retaining lip 30 disposed thereunder. If desired, an opening 32 may be provided in the upper portion of cap 24 for insertion of a finger to facilitate removal of the cap from the bottle 18.

FIG. 4 illustrates a cylindrical container 34 similar to an ordinary can. The container, however, is entirely molded of the resin wax of this invention, and the cap portion 36 may be press-fitted or heat-sealed, if the contents permit, in a conventional manner.

With reference to FIG. 5, a writing implement 38 is pictured consisting of the stylus portion 40 and a cap portion 42. The stylus portion may simulate a conventional ball point pen having a metal point assembly 44 and a barrel 46 containing the ink reservoir formulated from the resin-wax of this invention utilized to contain the writing fluid. In the alternative, barrel portion 46 may be used to contain a graphite lead and the barrel portion utilized in substitution for the wooden portion 65 of an ordinary writing pencil. The wax of this invention is susceptible to sharpening in a common pencil sharpener, and accordingly such a wax pencil would be used

in the manner equivalent to the manner of using an ordinary wooden pencil.

With reference to FIG. 6, a molded box 48 may be formed with a resin-wax inner container 50 surrounded by a decorative paper wrapping 52. Wrapping 52 may have any appropriate indicia stencilled or printed thereon.

In addition to conventional paper or wax-paper labels and the like which may be utilized with the containers of this invention, ordinary dyed paraffin wax may be used to paint appropriate designs on the containers as desired. In addition, the container material comprising a wax and resin blend includes the plasticizing oil, but may also include a conventional dye for achieving any desired aesthetic feature. The dye would be added, in a conventional manner similar to that utilized in candle-making, to the molten material before it is molded.

The resin-wax blend of this invention has a melting point of about 175° F and a pour point of about 200° F. Accordingly, the wax material will be maintained at a temperature high enough for sterilization before molding and if the molding process is carried out in a sterile environment, molded containers may be easily formulated for packaging medicines or food products.

As indicated above, the quantity of oil utilized will determine the rigidity of the molded structure, and with use of the lesser quantity of oil it will be possible to formulate for example a bottle that will shatter upon impact. In the alternative, the normal wax utilized, such as Chevron Coat 525 obtained from Standard Oil Company, is sufficiently resilient to provide a relatively unbreakable container.

Containers formulated according to the process of this invention have been tested containing water, ketchup, vinegar, alcohol, gasoline, acetone, ammonia, bleach, cannister sets, coffee, liquid and solid soap products, syrup, hairspray and many other household items. In over 16 months of testing, no change in taste, color, or odor has been detected in the materials contained except that the wax container has, in the instance of ketchup, acquired an interior red coating.

In summary then, this invention comprises a method for packaging materials wherein said materials are disposed within a package that is readily disposable in an incinerator or in a sanitary landfill. The material will completely combust at the normal incineration temperatures. In a sanitary landfill, the pressure and heat from packing will ultimately cause the degredation of the wax-resin container. However, in normal usage and storage, the container of this invention will resist abrasion and contain a wide variety of different materials without affecting the taste or color thereof for desired periods of time.

The material utilized as described above is a blend of a paraffin, microcrystalline, or similar petroleum derivative wax with preferably 10% of a resin compatible therewith such as ethylene-vinyl acetate, polyethylene, polypropylene, and the like from 1 to at least 20% or more could be used, as desired.

The containers of this invention are molded and formed by conventional techniques and may be decorated with a dyed, thinned wax, or with conventional paper or equivalent labels.

Finally, containers of this invention may have special purpose metal or plastic gaskets, retaining rings or the like, in order to facilitate sealing or in order to resist access thereto.

The process of this invention is intended to be utilized with a wide variety of different types of packaging. Bottles, closed cylinders, rectangular packages, open containers for beverage cans or bottles, flower pots and decanters may all be formulated according to the process of this invention with the above resin-wax blend. In addition, writing implements such as ball point pens or ordinary lead pencils may be formulated according to this invention. In the case of a pen, the normally plastic or metal body used to contain the writing fluid may be molded from the hardened wax of this invention. In the case of a pencil, it is anticipated that the normally wooden portion which contains the writing lead could be of the resin wax of this invention.

The following are then merely representative examples of formulation according to this invention.

With reference to FIG. 1, a bottle 10 is depicted having threads 12 molded therein for attachment of a cap 14. Both the cap 14 and the bottle may be molded from the resin wax from this invention. In addition, a rubber or deformable plastic washer 16 may be disposed within the cap 14 to provide a seal when the cap is placed on the bottle. It will be obvious to those skilled in the art that the cap 14, if desired, could be formulated out of plastic, metal or a metal shell (not shown) could surround the cap for additional protection and to provide a gripping surface for ease in opening.

Most importantly, however, the wax material of this invention containing the resin is sufficiently abrasive-resistant to permit threading a cap of the same material thereon without deformation.

The bottle 10 could have a score line 17 formed therein to permit opening by fracturing along the score line. Such a container could then be opened without removing the cap, as by impact, cutting, or biting.

In the alternative, FIG. 2 depicts a jar cap or bottle cap which may be press-fitted onto a container (not shown).

With reference to FIG. 3, bottle 18 formulated of the resin-wax material of this invention may have a metal ring 20 press-fitted on the neck 22 for cap retention as an alternative to the use of threads. Cap 24 also formulated of the resin-wax of this invention may be equipped with an internal ring 26 having a retaining lip 28 adapted to receive ring 20. Fitting 26 may be constructed of rubber, plastic or the like and is retained by the retaining lip 30 disposed thereunder. If desired, an opening 32 may be provided in the upper portion of cap 24 for insertion of a finger to facilitate removal of the cap from the bottle 18.

FIG. 4 illustrates a cylindrical container 34 similar to an ordinary can. The container, however, is entirely molded of the resin wax of this invention, and the cap portion 36 may be press-fitted or heat-sealed, if the contents permit, in a conventional manner.

With reference to FIG. 5, a writing implement 38 is pictured consisting of the stylus portion 40 and a cap portion 42. The stylus portion may simulate a conventional ball point pen having a metal point assembly 44 and a barrel 46 containing the ink reservoir formulated from the resin-wax of this invention utilized to contain the writing fluid. In the alternative, barrel portion 46 may be used to contain a graphite lead and the barrel portion utilized in substitution for the wooden portion 65 of an ordinary writing pencil. The wax of this invention is susceptible to sharpening in a common pencil sharpener, and accordingly such a wax pencil would be used

in the manner equivalent to the manner of using an ordinary wooden pencil.

With reference to FIG. 6, a molded box 48 may be formed with a resin-wax inner container 50 surrounded by a decorative paper wrapping 52. Wrapping 52 may have any appropriate indicia stencilled or printed thereon.

In addition to conventional paper or wax-paper labels and the like which may be utilized with the containers of this invention, ordinary dyed paraffin wax may be used to paint appropriate designs on the containers as desired. In addition, the container material comprising a wax and resin blend includes the plasticizing oil, but may also include a conventional dye for achieving any desired aesthetic feature. The dye would be added, in a conventional manner similar to that utilized in candle-making, to the molten material before it is molded.

The resin-wax blend of this invention has a melting point of about 175° F and a pour point of about 200° F. Accordingly, the wax material will be maintained at a temperature high enough for sterilization before molding and if the molding process is carried out in a sterile environment, molded containers may be easily formulated for packaging medicines or food products.

As indicated above, the quantity of oil utilized will determine the rigidity of the molded structure, and with use of the lesser quantity of oil it will be possible to formulate for example a bottle that will shatter upon impact. In the alternative, the normal wax utilized, such as Chevron Coat 525 obtained from Standard Oil Company, is sufficiently resilient to provide a relatively unbreakable container.

Containers formulated according to the process of this invention have been tested containing water, ketchup, vinegar, alcohol, gasoline, acetone, ammonia, bleach, cannister sets, coffee, liquid and solid soap products, syrup, hairspray and many other household items. In over 16 months of testing, no change in taste, color, or odor has been detected in the materials contained except that the wax container has, in the instance of ketchup, acquired an interior red coating.

In summary then, this invention comprises a method for packaging materials wherein said materials are disposed within a package that is readily disposable in an incinerator or in a sanitary landfill. The material will completely combust at the normal incineration temperatures. In a sanitary landfill, the pressure and heat from packing will ultimately cause the degredation of the wax-resin container. However, in normal usage and storage, the container of this invention will resist abrasion and contain a wide variety of different materials without affecting the taste or color thereof for desired periods of time.

The material utilized as described above is a blend of a paraffin, microcrystalline, or similar petroleum derivative wax with preferably 10% of a resin compatible therewith such as ethylene-vinyl acetate, polyethylene, polypropylene, and the like from 1 to at least 20% or more could be used, as desired.

The containers of this invention are molded and formed by conventional techniques and may be decorated with a dyed, thinned wax, or with conventional paper or equivalent labels.

Finally, containers of this invention may have special purpose metal or plastic gaskets, retaining rings or the like, in order to facilitate sealing or in order to resist access thereto.

The invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The present embodiments are therefore to be considered in all respects as illustrative and not restrictive, the scope of the invention being indicated by the appended claims rather than by the foregoing description, and all changes which come within the meaning and range of equivalency of the claims are therefore intended to be embraced herein.

What is claimed and desired to be secured by United States Letters Patent is:

1. A process for providing an abrasion resistant, disposable container for materials comprising the steps of providing a petroleum wax having a melting point of at least about 160° F., heating said wax above its melting point and blending therewith a resin polymer selected from the group consisting of ethylene-

vinyl acetate, polyethylene, and polypropylene, said polymer being present in a concentration of no more than about 10% of said blend; molding said blend to form said container.

2. The process of claim 1 wherein said blend further comprises a plasticizer.

3. The process of claim 1 wherein said polymer is present in a concentration of about 10% of said blend.

4. The process of claim 1 wherein said container is a bottle, said process further comprising:

providing a metal retaining ring; mounting said ring on the neck of said bottle adjacent the opening therein; providing a stopper therefor having a resilient, depending skirt portion adapted to fit over said ring and thereby retain said stopper on said bottle opening.

* * * * *



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

**2 6 NOV 1976**

OFFICE OF
AIR AND WASTE MANAGEMENT

Honorable James O. Eastland
United States Senate
Washington, D.C. 20510

*Exhibit H*

Dear Senator Eastland:

Thank you for your letter of October 18 on behalf of Mr. Larry E. Urbani of the Security Holding Enterprise, Inc., of Van Cleave. Mr. Urbani is interested in the availability of funds for research in furthering the development of a new wax material which will be used in making containers.

At the present time, our limited research funds in EPA are being used primarily in research to prevent environmental insult from land-filling of solid wastes, treatment and disposal of hazardous wastes, and the recovery of resources from solid waste.

While rapid degradable packaging would have certain advantages in reducing blight from litter, it would not contribute materially to environmental protection or to the conservation of natural resources. In view of this, considering our research priorities, we do not feel that we could provide assistance to this type of product development.

Again, thank you for your letter and interest in our solid waste management activities. If we can provide further assistance, please let me know.

Sincerely yours,

Sheldon Meyers
Deputy Assistant Administrator
for Solid Waste Management Programs

*Exhibit 5*

# Plastic Drink Bottles
# On Way To Supermarkets

NEW YORK (AP) — You might have thought plastic beverage bottles were banned this month by the Food and Drug Administration because their ingredients of the plastic might be linked to cancerous lesions.

You are wrong. Industry sources expect about a quarter billion of them to be on store shelves by the end of the year, and estimate that two years from now the figure will be more than two billion.

The explanation lies in the plastic. The FDA on Sept. 20 banned acrylonitrile, but it said nothing about polyester. The latter has a different chemical makeup, while presenting no different appearance to the untrained eye.

The FDA decision means that acrylonitrile bottles must be off the market by the end of the year, although spokesmen for that agency say all such bottles may already have been removed from circulation.

That might be the end of one scene, but it's where the play really gets interesting — where a cast of characters interfaces: Coca-Cola, Pepsi-Cola, chemical companies, a big tire concern, the liquor and textile industries, environmentalists, the stock market and, as they say, many, many more.

The curtain lifts with the soft drink companies seeking a safe, shatterproof, easily recyclable bottle. At first, failure; the economics unworkable. Then the

conclusive judgments. The polyester bottle, they note with suspicion, is a throwaway. Throwaways litter.

Goodyear says that won't be so. The 32-ounce and 64-ounce bottles for which polyester is being used aren't the kind you purchase along the roadside, it says. And, it stresses, they're recyclable.

Lest you not understand the significance of that, Thomas Minter, Goodyear executive vice president (research and development), intones these unforgettable lines:

"The polyester bottle you drink from today could be the pants you wear tomorrow."

A show-stealer, he will not be stopped: "Just 12 half-gallon bottles could provide enough fabric for a pair of pants. Add 18 more and you've got a vest and jacket to match."

Including production costs, he continues, recycled polyester is considerably less expensive than the virgin material. But why recycle at all — why not affix a deposit charge to the purchase and have the bottles returned?

Out of the question, he replies. The purification process demands reheating, and when you reheat a polyester bottle it loses its shape.

And so, for the time being, the polyester curtain falls. But there might be more. Monsanto, which makes acrylonitrile, declares the FDA decision "unwarranted." And that could mean a courtroom scene to follow.



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

26 NOV 1976

Honorable James O. Eastland
United States Senate
Washington, D.C. 20510

Dear Senator Eastland:

Thank you for your letter of October 18 on behalf of Mr. Larry E. Urbani of the Security Holding Enterprise, Inc., of Van Cleave. Mr. Urbani is interested in the availability of funds for research in furthering the development of a new wax material which will be used in making containers.

At the present time, our limited research funds in EPA are being used primarily in research to prevent environmental insult from land-filling of solid wastes, treatment and disposal of hazardous wastes, and the recovery of resources from solid waste.

While rapid degradable packaging would have certain advantages in reducing blight from litter, it would not contribute materially to environmental protection or to the conservation of natural resources. In view of this, considering our research priorities, we do not feel that we could provide assistance to this type of product development.

Again, thank you for your letter and interest in our solid waste management activities. If we can provide further assistance, please let me know.

Sincerely yours,

Sheldon Meyers
Deputy Assistant Administrator
for Solid Waste Management Programs

COMMITTEE ON THE
THIS IS THE JUDICIARY
DEPT
WASHINGTON
D.C.

FROM
JAMES O.
EASTLAND
11-29-1976
EPA

JAMES O. EASTLAND, MISS., CHAIRMAN

JOHN L. McCLELLAN, ARK.          ROMAN L. HRUSKA, NEBR.
PHILIP A. HART, MICH.            HIRAM L. FONG, HAWAII
EDWARD M. KENNEDY, MASS.         HUGH SCOTT, PA.
BIRCH BAYH, IND.                 STROM THURMOND, S.C.
QUENTIN N. BURDICK, N. DAK.      CHARLES McC. MATHIAS, JR., MD.
ROBERT C. BYRD, W. VA.           WILLIAM L. SCOTT, VA.
JOHN V. TUNNEY, CALIF.
JAMES ABOUREZK, S. DAK.

FRANCIS C. ROSENBERGER
CHIEF COUNSEL AND STAFF DIRECTOR

**United States Senate**

COMMITTEE ON THE JUDICIARY
WASHINGTON, D.C. 20510

November 29, 1976

Mr. Larry E. Urbani
Security Holding Enterprise, Inc.
Route 4, Box 268
Van Cleave, Mississippi 39564

Dear Mr. Urbani:

Pursuant to our earlier correspondence, the Environmental Protection Agency has furnished me the enclosed report on your request for funds for research in furthering the development of a new wax material which will be used in making containers.

Unfortunately, the Agency does not feel that it can provide assistance for this type of product development. When you have reviewed this report, please let me know if you feel I can be of further assistance.

With kindest regards and best wishes,

Sincerely,

Jim Eastland
U. S. S.

JOE:bl

WITH KINDEST REGARDS & BEST WISHES,
WHAT POOP!

1977

## Monsanto Co. Closes Three Bottle Plants; FDA Action Is Cited

*By a WALL STREET JOURNAL Staff Reporter*

ST. LOUIS — Monsanto Co. said it will temporarily suspend production at all three of its Cycle-Safe bottle-fabrication plants because of "uncertainties" created by a recent Food and Drug Administration statement on plastic bottles.

Almost 600 employees will be laid off, the company said. Recently, the FDA rescinded its approval of the bottles, though their sale remains legal.

"Our customers have elected to temporarily cancel orders pending clarification from the FDA," E. S. Bauer, executive vice president, said.

The FDA cited studies showing that a material called acrylonitrile, used to make the bottles, might cause growths in test animals. Monsanto had worked on its plastic bottle for about 10 years.

Coca-Cola bottlers have been using the Cycle-Safe bottle.

Mr. Bauer said that Monsanto representatives met twice last week with FDA officials to ensure that the federal agency had all available data about the container. He said: "We are hopeful that the FDA will act promptly to establish an equitable, realistic and measurable standard for our containers. Monsanto remains confident that Cycle-Safe bottles are completely safe and pose no hazards to consumers."

Bottle plants at South Windsor, Conn., Havre de Grace, Md., and Park Forest South, Ill., were closed at close of business last Friday. A Lopac resin-production unit at Springfield, Mass. was similarly affected.

---

## Monsanto Still Confident

...cation plants and a resin plant employing about 800 workers. The plants are in Park Forest, Ill., South Windsor, Conn., and Havre de Grace, Md., and Springfield, Mass.

The three-judge appellate court panel called the FDA action "arbitrary and capricious." The judges said the agency "deprived the petitioner of the prompt hearing to which it was statutorily entitled."

...will demonstrate the safety of the plastic bottles.

In a letter to be mailed Monday to shareholders, the company said the suspension of its bottle operations could cost the company 40 to 45 cents a share on 1977 earnings. Last year the company earned $366 million, or $10.05 a share.

The proposed FDA ban last month caused Monsanto to shut down three bottle fabri-

...the bottles have leaked the chemical acrylonitrile into the containers' contents. The agency said the chemical has caused birth defects and nervous system lesions in laboratory animals.

Monsanto, which made the bottles for the Coca-Cola Co. and planned to market them for other beverages, asked for the hearings to challenge the FDA findings. A company spokesman said the hearings

### PLASTIC BAN DELAYED

ST. LOUIS (UPI) — The Monsanto Co. says it is confident that public hearings will show the firm's plastic beverage bottles are safe.

A federal appeals court in Washington has set aside until May 18 a ban on the bottles proposed by the Food and Drug Administration. The court ordered the agency to hold prompt public hearings.

The FDA says tests show

ACI/ICD/71/ICE

ditions.

The resistance of *Ultrathene* UE 630 ethylene-vinyl acetate to staining has also been examined. The copolymer is stain resistant to coffee and grape juice at room temperature. However, tincture of iodine and merthiolate (an antiseptic and germicide) stain the resin slightly at room temperature.

To determine stain resistance to iodine, grape juice, coffee, and merthiolate, cut strips of the resin were tested at 70° and 140°F (21° and 60°C). The iodine was a commercially available 2% tincture, the merthiolate a commercially

| Material | Concentration | Temperatures 70°F (21°C) | Temperatures 140°F (60°C) |
|---|---|---|---|
| Grape juice | — | S | S |
| Coffee | — | S | O |
| Merthiolate | 0.1% | O | O |
| Iodine | 2% | O | U |

S = satisfactory (no stain)  O = slight stain
U = unsatisfactory (very noticeable stain)

**Table 3** Stain resistance of *Ultrathene* UE 630 to some liquids

available 0.1% tincture. Table 3 lists resistance to staining determined for *Ultrathene* UE 630.

OK FOR ① PRODUCING, ② MANUFACTURING ③ PACKING ④ PROCESSING ⑤ TREATING ⑥ PACKAGING ⑦ TRANSPORTING ⑧ HOLDING *FOOD*

# Food and Drug Administration (FDA) Status

APPROVED ELVAX FOR FOOD PACKAGING

*Ultrathene* ethylene-vinyl acetate copolymer resins meet the FDA food-packaging requirements established in Federal Register, Subpart F, Section 121.2570 and Section 121.2526 (c) conditions of use (Table 2) E.F. and G. Some *Ultrathene* resins also meet conditions of use C and D.

Section 121.2570 specifies that ethylene-vinyl acetate copolymers of the *Ultrathene* type may be safely used in articles "intended for use in producing, manufacturing, packing, processing, treating, packaging, transporting, or holding food." — Section 121.2526 (c) permits for the same uses paper and paperboard coated with such copolymers. — Conditions D, E, F, and G specify that such copolymers can be safely used for coating containers used for hot filling or pasteurizing below 150°F (65°C) and, provided no heat treatment will take place in the containers, for filling and storing at room temperature and for refrigerated and frozen storage. — Condition C specifies use for hot filling or pasteurizing at temperatures from 150°F (65°C) to the boiling point of water, 212°F (100°C).

Fig. 18 shows an item used in the home, injection-

MELTS AT 460°

molded from an *Ultrathene* resin which meets FDA requirements.



**Figure 18** Plastic pourer seal, injection molded from *Ultrathene* resin



I HAD OTHER PICTURES
WITH MR. WILSON
BUT BURNED DOWN
3 TIMES

MR. SANDY DRAKE "HE'S THE ONE THAT GOT ME INTO THE WHITEHOUSE
WITH NO APPOINTMENT — ONLY 800 WITHIN CANDLES
SHANDY SHAKING HANDS WITH PRESIDENT GERALD FORD

IF YOU WANT TO TALK TO A 'KING', — BRING HIM A GIFT!

February 24, 1978

Mr. Larry Urbani                                    Re:  #247
~~209 Mill Street~~ RT4, BOX 268                    Container Material
~~Lucedale, MS  39452~~ VANCLEAVE, MISS
                              39564

Dear Mr. Urbani:

The evaluation of your invention has been completed, and the
results are summarized in the enclosed computer printout.

Our evaluation is designed to offer you information about
some of the strengths and weaknesses of your proposed product.
Thirty-three criteria are considered in determining a product's
potential for success.  Each criterion score is then programmed
into a computer, and the analysis is completed.

The computer printout should indicate the negative or positive
possibilities of your invention and whether or not your idea
warrants further research.  Unfortunately, due to our limited
staff and resources, the Innovation Center cannot conduct this
research for you.  We would like to make some suggestions,
however, for possible activities on your part should you decide
on the basis of the printout to further develop your invention.
Some of these suggestions will not apply, of course, to some
products or, you might have already pursued some of them;
however, we feel that as general guidelines, these principles
will be useful in helping you with your idea.  The information
you receive from these activities should assist you in making
an intelligent decision regarding the investment of additional
time and/or money into your idea.

Please do not hesitate to contact us if you have questions
about the enclosed printout, or the suggestions on market
research.

We wish you every success in the future.

Sincerely,

Robert H. Kono
Robert H. Kono
Client Relations Coordinator

RHK:ckw

cjb 08/08/77



MS Mehr

09/01/76          719,360

Larry H. Urbani

R E C E I V E D

Paper No. 7

MAILED

AUG 9 1977

LeBLANC & SHUR

LS NO._____

AUG 8 1977

GROUP 320

*DCC* *cejb 08/8/77*
*NO A pc*

Le Blanc and Shur
11th Flr., 1750 K Street, N.W.
Washington, D.C.   20006

This is a communication from the Examiner in charge of your application.

Commissioner of Patents

1. ☐   The communication filed _____ is informal /non-responsive for the reason(s) checked below and should be corrected. *APPLICANT IS GIVEN ONE MONTH FROM THE DATE OF THIS LETTER OR UNTIL THE EX-PIRATION OF THE PERIOD FOR RESPONSE SET IN THE LAST OFFICE ACTION (WHICHEVER IS LONGER) WITHIN WHICH TO CORRECT THE INFORMALITY.*

   a. ☐ The amendment to claim(s)_____ , filed _____ , fails to comply with the provisions of rule 121 and is accordingly held to be non-responsive. A supplemental paper correcting the informal portions and complying with the rule is required.

   b. ☐ The paper is unsigned. A duplicate paper or ratification, properly signed, is required.

   c. ☐ The paper is signed by _____ , who is not of record. A ratification or a new power of attorney with a ratification, or a duplicate paper signed by a person of record, is required.

   d. ☐ The communication is presented on paper which will not provide a permanent copy. A permanent copy, or a request that a permanent copy be made by the Office at applicant's expense, is required. See M.P.E.P. 714.07.

   e. ☐ Other

2. ☐   In accordance with applicant's request, *THE PERIOD FOR RESPONSE FROM THE OFFICE ACTION DATED* _____ *IS EXTENDED TO RUN* _____ *MONTH(S).*

   No further extension will be granted unless approved by the Commissioner. Rule 136(b).

3. ☐   This application is being forwarded to Abandoned Files Unit in view of:

   a. ☐ The letter of express abandonment which is in compliance with rule 138.

   b. ☐ Applicant's failure to file the response received _____ within the period set.

4. ☑   All of the claims being allowable, prosecution on the merits is closed in this application and the Notice of Allowance or other appropriate communication will be sent in due course, in view of:

   a. ☑ Applicant's communication filed *Jul 18, 1977* .

   b. ☐ Telephone interview with _____ on _____ .

   c. ☐ Personal interview with _____ on _____ .

   d. ☐ An Examiner's Amendment will follow.

5. ☐   Receipt is acknowledged of papers submitted under 35 U.S.C. 119 which papers have been made of record in the file.

6. ☐   Other

*MS Mehr*

MILTON S. MEHR
EXAMINER
GROUP ART UNIT 321

POL-327 (Rev. 9/70)



**U.S. DEPARTMENT OF COMMERCE**
**Patent Office**

Address Only: COMMISSIONER OF PATENTS
Washington, D.C. 20231

MS Mehr

09/01/76          719,360

Larry H.  Urbani

R E C E I V E D

Paper No. 7

MAILED

AUG 9 1977

LeBLANC & SHUR

LS NO._____

AUG 8  1977

GROUP :20

*DCC*
*call v8/8/77*
*NO A pc*

Le Blanc and Shur
11th Flr, 1750 K Street, N.W.
Washington, D.C.  20006

This is a communication from the Examiner in
charge of your application.

Commissioner of Patents

1. ☐   The communication filed _____ is informal /non-responsive for the reason(s) checked below and should be

corrected. *APPLICANT IS GIVEN ONE MONTH FROM THE DATE OF THIS LETTER OR UNTIL THE EX-*

*PIRATION OF THE PERIOD FOR RESPONSE SET IN THE LAST OFFICE ACTION (WHICHEVER IS*

*LONGER) WITHIN WHICH TO CORRECT THE INFORMALITY.*

a. ☐  The amendment to claim(s)_____ , filed _____ , fails to comply with the pro-

visions of rule 121 and is accordingly held to be non-responsive. A supplemental paper correcting the informal

portions and complying with the rule is required.

b. ☐  The paper is unsigned. A duplicate paper or ratification, properly signed, is required.

c. ☐  The paper is signed by _____ , who is not of record. A ratification or a

new power of attorney with a ratification, or a duplicate paper signed by a person of record, is required.

d. ☐  The communication is presented on paper which will not provide a permanent copy. A permanent copy, or a

request that a permanent copy be made by the Office at applicant's expense, is required. See M.P.E.P. 714.07.

e. ☐  Other

2. ☐   In accordance with applicant's request, *THE PERIOD FOR RESPONSE FROM THE OFFICE ACTION DATED*

_____ *IS EXTENDED TO RUN*_____ *MONTH(S).*

No further extension will be granted unless approved by the Commissioner. Rule 136(b).

3. ☐   This application is being forwarded to Abandoned Files Unit in view of:

a. ☐  The letter of express abandonment which is in compliance with rule 138.

b. ☐  Applicant's failure to file the response received _____ within the period set.

4. ☑   All of the claims being allowable, prosecution on the merits is closed in this application and the Notice of Allowance

or other appropriate communication will be sent in due course, in view of:

a. ☑  Applicant's communication filed Jul 18, 1977 .

b. ☐  Telephone interview with _____ on _____ .

c. ☐  Personal interview with _____ on _____ .

d. ☐  An Examiner's Amendment will follow.

5. ☐   Receipt is acknowledged of papers submitted under 35 U.S.C. 119 which papers have been made of record in
the file.

6. ☐   Other

MILTON S. MEHR
EXAMINER
GROUP ART UNIT 321

LAW OFFICES OF

**LeBlanc and Shur**

1750 K STREET, N.W.

WASHINGTON, D.C. 20006

ROBERT E. LeBLANC
HENRY SHUR
LEONARD F. STOLL
DONALD C. CASEY
EDWARD J. KESSLER
WILLIAM K. WELLS, JR.

TELEPHONE
(202) 785-9020

CABLE-RELSHURPAT

TELEX 89-7427

April 14, 1978

Mrs. Larry H. Urbani
Route 4, Box 268
Van Cleave, Mississippi 39564

     Re: U. S. Patent 4,071,943
        Our Ref. LS-11871

Dear Mrs. Urbani:

    In response to your telephone request of April 13, 1978, enclosed herewith are two copies of the above noted patent. Upon proof-reading, errors noted in printing were so minor that a Certificate of Correction was not applied for.

    Accordingly, the enclosed copies will be the final version. If you note any corrections needed, please advise and we will apply for the appropriate Certificate.

    Sincerely,

Donald C. Casey

    Donald C. Casey

DCC:mtf
Enclosures

August 11, 1976

Mr. Donald C. Casey
LeBlanc and Shur
1750 K Street, N.W.
Washington, D.C., 20006

Dear Mr. Casey:

In response to your letter of July 30, 1976, I am attempting
to answer your questions, commencing at the bottom of page 1,
as asked.

1.   WAX SPECIFICATIONS:

There are many waxes and additives to combine to reach
desired objective - to withstand pressure, weight,
tropical temperature, etc., depending on various app-
lications.

2.   WAX ADDRESS:

Standard Oil Co. of California
Myron A. Wiggs
Mgr. Government Special Accounts Div.
575 Market St.
Western Operations, Inc.
San Francisco, Calif., 94105

We don't have specifications, but listed in #8 of this letter
are companys, any one of which can give suitable information.

Patent slanted toward using wax as a basic ingredient, initial
building block, adding ingredients that contain some of the
mixed ingredents already.

LAW OFFICES OF

LeBLANC and SHUR

1750 K STREET, N.W.

WASHINGTON, D.C. 20006

TELEPHONE
(202) 785-9020

CABLE-RELSHURPAT
TELEX 89-7427

ROBERT E. LeBLANC
HENRY SHUR
LEONARD F. STOLL
DONALD C. CASEY
EDWARD J. KESSLER
WILLIAM K. WELLS, JR.

August 30, 1977

Mr. Larry H. Urbani
Route 4, Box 268
Van Cleave, Mississippi  39564

Re:  U. S. Patent Application
Serial No. 719,360
Our Ref:  LS-11871
*PATENT # 4071943*

Dear Larry:

We are pleased to forward herewith a copy of the Official Notice of Allowance in this application dated August 25,1977 and allowing 4 claims.

As you will note from the enclosed copy of the Notice of Allowance, the Government Issue Fee is $100.00 plus $2.00 for each sheet of drawing, plus $10.00 for each printed page of specification (including claims) or portion thereof.  Inasmuch as the final number of printed pages cannot be determined in advance of printing, an initial Base Issue Fee (consisting of the fee for printing the first page of specification - $10.00, plus the fee for each sheet of drawing - $2.00, added to the fee of $100.00) must be paid to the Patent Office within three months, i.e. on or before November 25, 1977.  The Base Issue Fee in this application is stated by the Patent Office to be $112.00. We estimate that this application will ultimately comprise 5 printed pages, for a total of $162.00.  The Patent Office sends a Notice of Balance of Issue Fee Due with the original patent, which must be paid within three months of issuance, or the patent will lapse.

To the foregoing Government fee must be added our service charge for processing the application to patent, including proofreading the issued patent against our file copy of the application, filing request to the Commissioner for a Certificate of Correction (if necessary), and providing patent copies, which service charge we estimate to be no more than $50.00.

We would be happy to take the necessary steps to secure issuance of this patent immediately upon receipt of your check in the amount of $212.00 to cover the previously stated estimated total issue costs.  Of course, if our estimate exceeds the actual printing or service costs, the excess will be refunded.

Please note that in order to avoid abandonment, the Base Issue Fee must be paid on or before November 25, 1977.  We look forward to receiving your instructions pursuant to the foregoing.

Sincerely,

Donald C. Casey

DCC:pr
Enc.

Mr. Larry H. Urbani
August 30, 1977
Page 2

We would be happy to take the necessary steps to secure issuance of this patent immediately upon receipt of your check in the amount of $212.00 to cover the previously stated estimated total issue costs.  Of course, if our estimate exceeds the actual printing or service costs, the excess will be refunded.

Please note that in order to avoid abandonment, the Base Issue Fee must be paid on or before November 25, 1977.  We look forward to receiving your instructions pursuant to the foregoing.

Sincerely,

Donald C. Casey

DCC:pr
Enc.

PTO-70-133
(Rev. 3-77)
(Formerly PTOL-85)



All communications regarding this application should give the serial number, date of filing, and name of the applicant.

## U.S. DEPARTMENT OF COMMERCE
## Patent and Trademark Office

Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

# NOTICE OF ALLOWANCE
# AND BASE ISSUE FEE DUE

The application identified below has been examined and found allowable for issuance of Letters Patent.

| FILING DATE | SERIAL NO. | NO. OF CLAIMS ALLOWED | EXAMINER AND GROUP ART UNIT | |
|---|---|---|---|---|
| 09/01/76 | 719360 | 4 | MEHR | 321 |

APPLICANT(S)

URBANI, LARRY H.; VAN CLEAVE, MISS.

TITLE OF INVENTION (* indicates amended by examiner)

WAX CONTAINER MATERIAL

MAILED AUG 25 1977

| BASE FEE COMPUTATION | | | BASE FEE DUE | CLASS-SUB |
|---|---|---|---|---|
| $100.00 + | $2.00 (FOR DWG. @ $2 PER SHEET) + $10 | (FOR FIRST PAGE PRINTED SPEC.) | $112.00 | 029/525.000 |

The complete Issue Fee is one hundred dollars ($100) plus two dollars ($2) for each sheet of drawing, plus ten dollars ($10) for each printed page of specification (including claims) or portion thereof.

Inasmuch as the final number of printed pages cannot be determined in advance of printing, an initial BASE ISSUE FEE (consisting of the fee for printing the first page of specification ($10) plus the fee of ($2) for each sheet of drawing, added to the fee of $100) *must be paid within three months from the date of this notice*, or the application shall be regarded as ABANDONED.

When remitting said Base Issue Fee, enclosed Form PTOL-85b should be used, and if use of a Deposit Account is being authorized, PTOL-85c should also be forwarded.

The Base Issue Fee will not be accepted from anyone other than the applicant, his assignee, attorney, or a party in interest as shown by the records of the Patent and Trademark Office.

If an assignment has not been previously filed and it is desired to have the patent issue to the assignee, the assignment must be received in this Office with the recording fee together with the Base Issue Fee. In any event, the appropriate space(s) under "Assignment Data" on PTOL-85b must be completed. Where there is an assignment, the assignee's address must be given to ensure its inclusion in the printed patent.

In connection with the address of the inventor(s), attention is directed to Form PTOL-231 enclosed.

A Notice of Balance of Issue Fee Due will be mailed together with the patentee's copy of the patent *if an additional fee is due*. Payment must be made within three months from the date shown on said Notice since FAILURE TO PAY THIS BALANCE WITHIN THE TIME SPECIFIED WILL RESULT IN LAPSE OF THE PATENT.

LE BLANC AND SHUR
11TH FLOOR
1750 K STREET NW
WASHINGTON, DC 20006

### IMPORTANT

ATTENTION IS DIRECTED TO RULE 334 <u>REVISED</u> NOVEMBER 4, 1969.

THE PATENT WILL ISSUE TO APPLICANT UNLESS AN ASSIGNEE IS SHOWN IN ITEM 2 ON FORM PTOL-85b, ATTACHED

P01    BATCH-D40

YOUR COPY—See reverse side for Base Issue Fee Record

LAW OFFICES OF

# LeBLANC and SHUR

1750 K STREET, N.W.

WASHINGTON, D.C. 20006

ROBERT E. LeBLANC
HENRY SHUR
LEONARD F. STOLL
DONALD C. CASEY
EDWARD J. KESSLER
WILLIAM K. WELLS, JR.

TELEPHONE
(202) 785-9020
CABLE-RELSHURPAT
TELEX 89-7427

August 9, 1977

Mr. Larry H. Urbani
Route 4, Box 268
Van Cleave, Mississippi  39564

> Re:  U. S. Patent Application
>      Serial No. 719,360
>      Our Ref:  LS-11871

Dear Larry:

　　　　We are delighted to inform you that we have now received a preliminary indication from the Patent Office that all claims in your above application have been allowed in response to our amendment of July 18, 1977. Enclosed herewith is a copy of the Patent Office notification for your records.

　　　　We will receive a formal Notice of Allowance in due course and will advise concerning the issue fee. However, prosecution of the application is now complete and the case will issue as a patent in due course.

Sincerely,

Donald C. Casey

DCC:pr
Enc.
cc: Mr. John Carr, w/Enc.